Ty D. Frankel (State Bar No. 027179)
tfrankel@bffb.com
**BONNETT FAIRBOURN FRIEDMAN & BALINT, PC**
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

Jeanne M. Christensen (*pro hac vice* to be submitted)
jchristensen@wigdorlaw.com
Lawrence J. Pearson  (*pro hac vice* to be submitted)
lpearson@wigdorlaw.com
Alfredo J. Pelicci (*pro hac vice* to be submitted)
apelicci@wigdorlaw.com
Anthony G. Bizien (*pro hac vice* to be submitted)
abizien@wigdorlaw.com
**WIGDOR LLP**
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Tiffany Gordwin,<br><br>                    Plaintiff,<br><br>v.<br><br>Amazon.com, Inc.,<br><br>                    Defendant. | Civil Action No.:<br><br>**COMPLAINT**<br><br><u>**Jury Trial Demanded**</u> |

Plaintiff Tiffany Gordwin ("Plaintiff" or "Ms. Gordwin"), hereby alleges through her counsel, as against Defendant Amazon.com, Inc. ("Amazon," the "Company" or "Defendant"), as follows:

**"[W]e have a lot of work to do."**

Andy Jassy, successor to Jeff Bezos as CEO.

1.      On March 8, 2021, in response to a Recode investigation that Black workers face an unlevel playing field in Amazon's corporate offices, Andy Jassy, the successor to Jeff Bezos as CEO, emailed certain Black employees and admitted that Amazon has "a lot of work to do" but defended Amazon against the allegations of racial inequality, calling recent articles "skewed portraits of the company."[1]  Shockingly, Jassy tried to excuse reports of mistreatment at Amazon by blaming history:

> "There's been systemic racism in the United States for 400 years. Prejudices, biases, and unjust accepted standards have been passed on through several generations, and they have put Black Americans at a meaningful disadvantage in many dimensions, ranging from education, treatment from law enforcement and courts, and economic opportunity."[2]

2.      Thankfully, Bezos, Jassy and the other white men leading Amazon[3] cannot escape liability for violations of anti-discrimination laws because of "generational bias." Amazon is expected to maintain a workplace that prohibits and prevents such insidious biases from contaminating the culture in spite of history.

3.      Sadly, in this same email, Jassy suggests that incidents of "unacceptable mistreatment" are inevitable at a company with hundreds of thousands of employees.[4]  This equally hollow excuse cannot explain away the numerous reports of employee discrimination at Amazon.  Such experiences are not outliers.

---

[1]  As reported by Jason Del Rey, https://www.vox.com/recode/22320625/amazon-andy-jassy-memo-race-discrimination-bias-harassment.

[2]  *Id.*; @DelRey.

[3]  Jeff Wilke, Dave Limp, Brian Olsavsky, David Zapolsky, Beth Galetti, Jay Carney, Dave Clark, Doug Herrington, Russ Grandinetti, Charlie Bell, Paul Kotas, Tom Taylor, Amit Agarwal, Peter DeSantis, Neil Lindsay, Rohit Prasad, Colleen Aubrey, Matt Garman, Christine Beauchamp, Peter Krawiec, Mike Hopkins, Alicia Boler Davis, John Felton and Dave Treadwell.

[4]  https://www.vox.com/recode/22320625/amazon-andy-jassy-memo-race-discrimination-bias-harassment.

4.     The stories of inequality keep coming from all corners of the country.  As the cases continue to surface, the question is how many experiences of discrimination will it take to make Amazon leaders believe that immediate, meaningful action must be taken?

5.     This case, together with four other cases filed today, are five more stories.[5]

6.     Five more female employees shamelessly discriminated against by Amazon, a company run almost exclusively by white men.  Our Clients' experiences demonstrate that Amazon's work environment perpetuates systemic racial, ethnic and sexual biases.

7.     As a representative cross-section of Amazon's workforce, collectively these five stories expose Amazon's hollow claims about a culture of no tolerance for discrimination or harassment.  Critically, these cases reveal the deeply entrenched default response at Amazon to internal protected complaints.  The only "action" that takes place at Amazon after an employee dares to report discrimination is additional mistreatment.  The retaliation in response to internal complaints often is even more damaging to the employee. Such a default response comes from the top.  It will not change until Amazon's leaders lead by example.

8.     Simply increasing the numbers of diverse employees does nothing to eradicate systemic bias if women and persons of color continue to experience one hurdle after another that results in unequal treatment at every step: recruitment, hiring, initial compensation valuation, training and support, advancement opportunities and promotions.

---

[5]  This case, filed by Tiffany Gordwin, is being filed simultaneously with the cases of other female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon: Diana Cuervo v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, national origin, gender discrimination and retaliation); Emily Sousa v. Amazon, et al. (U.S. District Court, District of Delaware) (race, national origin, gender discrimination and retaliation); Pearl Thomas v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, gender discrimination and retaliation); and Cindy Warner v. Amazon, et al. (U.S. District Court, Central District of California) (gender discrimination and retaliation).

Such unequal treatment causes higher levels of attrition among women and persons of color, thereby perpetuating the internal problems.

### The Numbers Speak For Themselves

9.      As part of her responsibilities in HR, Ms. Gordwin had access to diversity and inclusion ("D&I") data for Amazon's U.S. employees reporting up to John Felton ("Felton").  Felton is the Vice President of Global Delivery Services, and he reports directly to Dave Clark, the head of the Worldwide Operations Team ("WW Ops")[6].  In August 2020, Felton became one of the 26 members of Bezos' elite "S-team."  In the U.S., approximately 13,600 employees reported up to Felton as of February 28, 2021.[7]

10.      The data shows the numbers of employees that were terminated, by level and by race.[8]  Although the numbers speak for themselves, the disparities are shocking.

11.      At L10,[9] Amazon's highest corporate tier, the data showed not a single termination for a person of color.  Presumably, no persons of color existed at L10.

---

[6]   Worldwide Operations Team is a critical team at Amazon, responsible for getting packages to customers' doors.   It oversees more than 175 operating fulfillment centers around the world and about 250,000 global employees.  The team also manages Amazon's thousands of delivery truck trailers and airplanes.

[7] The dataset includes employee diversity numbers from January 1, 2015 through February 28, 2021.  The total employee number includes employees in technology categories such as IT and engineering.  Data showing employee breakdowns by gender was not available to Ms. Gordwin.

[8]   Upon belief, the sub-classifications of the data as between regretted and unregretted terminations shows that BLNA employees have a much higher rate of unregretted terminations.

[9] According to Amazon's self-reported EEO-1 reports, it classifies employees from L1-L3 as "field employees" and employees from L4-L8, L10 as "corporate" employees.  There is no L9.

12. In 2018 and 2020 at L8, similarly, not one BLNA[10] employee was terminated. In 2019, the data showed that BLNA employees made up just 7% of all L8s, yet BLNA employees represented 12.5% of all terminations that year.[11]

13. Predictably, the data reflects that in 2018, not a single BLNA employee was promoted (0%) whereas 16 white and Asian employees were promoted (100%).

14. In 2019, at the L7 level BLNA employees constituted just 9.8% of all L7 employees that year.  Incredibly, the data shows 13 terminations for BLNA employees which represented 24% of all terminated L7 employees.

15. In stark contrast, white and Asian employees represented 90% of all L7 employees, but just 64% of all terminations.

16. Promotions for this 2019 group of L7 employees is equally horrific.  Out of a total of 15 promotions, only two of the 15 were BLNA employees, suggesting that Amazon is not trying nearly as hard as it claims to provide more opportunities for diverse employees.

17. Similarly, in 2018 for L6 employees, BLNA employees represented 9% of all employees that year whereas white and Asians represented 91%. Despite this disparity, 23 BLNA employees were terminated representing 15% of all terminations whereas just 50% were for white employees.  What is shocking is that the numbers barely improve.  In 2019 at the L6 level, BLNA employees represented 14.5% of all employees terminated versus whites at 56% with the same relative total employee percentages.

18. Statistically, there is no rational explanation for why BLNA employees are terminated at substantially higher rates than white employees while simultaneously promoted at far lower levels.  This double-hurdle roadblock insures that meaningful change

---

[10] The term "BLNA" is an Amazon derived grouping of Black/African American, Hispanic/Latino and American Indian/Alaskan Native employees.

[11] The data provides the average percentage by race by level from January 1, 2015 through February 28, 2021.  This fact clouds the numbers as to how many persons of color worked at the L8 level during 2015-2018, for example.

at Amazon is miles away from achievement.[12]  Unquestionably, Amazon has "**a lot of work to do**."

19.    Troublingly, when it comes to Amazon, Ms. Gordwin's story is a familiar one.

20.    In April 2019, after first being screened by a recruiter, she applied for a Level ("L") 6 Human Resources ("HR") Manager role.  Four in-person interviews later, Ms. Gordwin was rejected.  Amazon told her that its policy is to favor internal employees, which purportedly is why she did not get the job.

21.    No sooner was she rejected for the HR Manager position when Amazon proactively reached out to Ms. Gordwin about a "business partner" position that it claimed was substantially the same position and carried equal opportunities for advancement.

22.    If a business partner position at Amazon truly equaled a manager position then there would be no reason for Amazon to convince Ms. Gordwin of this alleged truth.  Why the positions are the "same" yet have different titles makes no sense.

23.    Nevertheless, because Ms. Gordwin had been excited at the prospect of working at Amazon when she first applied to the manager position and became more excited by the time she got to her fourth in-person interview, she was receptive to hearing about the business partner position.

24.    Indeed, Amazon counts on people becoming excited to work there during the interview process.  Like many others before her, Ms. Gordwin was persuaded to apply for a lesser position than she originally qualified and interviewed for.

25.    In May 2019, she was hired as an HR business partner, Level 6.

---

[12]  An opportunity exists for meaningful change as Institutional Shareholder Services, a proxy firm, is recommending that Amazon investors vote in favor of an independent racial audit.  The vote is set for May 26, 2021 at the annual shareholder meeting. Amazon is asking shareholders to reject the audit.  https://www.seattletimes.com/business/amazon-investors-urged-by-proxy-firm-to-vote-in-favor-of-racial-audit/

26.     Amazon may claim that it engages in such de-leveling tactics at the hiring stage to all applicants.  But there is no question that female applicants are de-leveled far more than men. And there is no question that minority females, especially those with dark skin, are subjected to the greatest degrees of de-leveling.

27.     Ms. Gordwin's bait and switch marked the beginning of an employment trajectory that went from bad to worse.

28.     Often the sole Black female in the room, Ms. Gordwin was treated like a second-class citizen by the majority of her supervisors, all white.  Rejected for numerous promotions, accused of speaking in aggressive (Black) tones, she watched as younger, less qualified white males eclipsed her to land managerial and Level 7 positions.

29.     Her current white male manager is younger than she is and working on his master's degree.  She completed her Master of Business Administration ("MBA") seven years ago.  This abysmal state of affairs continues through the present.

30.     Ms. Gordwin's experience is not unique.  Rather, her treatment is part of systemic racial and gender bias at Amazon. Ms. Gordwin commenced this action to hold Amazon accountable.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

33.     Simultaneous with the commencement of this action, Plaintiff will file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); and the Arizona Civil rights Act, Arizona Revised Statutes §§ 41-1461 *et seq.* ("ACRA").

34.     Per the EEOC's work-sharing agreement with Arizona's Office of the Attorney General Civil Rights Division ("CRD"), Plaintiff's charge of discrimination will be cross-filed with the CRD.

35.     Upon the EEOC's completion of its investigation into Ms. Gordwin's charge of discrimination and/or issuance of a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add Title VII, ADA and ACRA Claims.

36.     Plaintiff has complied with any and all other prerequisites to filing this action.

## PARTIES

37.     Plaintiff is a Senior HR Specialist at Defendant Amazon.com, Inc. and resides in Avondale, Arizona.  At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

38.     Defendant Amazon.com, Inc. is a foreign corporation with its operations in Phoenix, Arizona and is duly organized and existing under and by virtue of the laws of the State of Delaware.  At all relevant times, Amazon has met the definition of an "employer" of Plaintiff under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.    Ms. Gordwin's Prior Experience and Hiring at Amazon

39.     Ms. Gordwin is 38-year-old, Black female with almost two decades of experience as a HR professional.

40.     Before joining Amazon, Ms. Gordwin held HR roles at a number of highly regarded companies including: Polyone Corporation (HR Generalist), The Home Depot (HR Manager) and NFI Industries (HR Manager).  While serving as a HR professional at Allstate Insurance Company in 2000, she played an instrumental role in staffing 1,000

Managers and Customer Service Professionals which required her to source and interview candidates.

41.     In 2011, Ms. Gordwin received her Bachelor of Arts from National-Louis University and in 2013, she received her MBA from Colorado Technical University.  Ms. Gordwin also served on the board of directors for her local chapter of the Society for Human Resources Management where she shared her HR expertise with other HR Professionals.

42.     On April 25, 2019, Ms. Gordwin applied for an HR Manager role (Level 6) supporting the Fulfillment Business Unit at Amazon's Joliet, Illinois fulfillment center.

43.     Based on the criteria, she was more than qualified for the position.

44.     On April 29, 2019, Ms. Gordwin had a screening interview with a recruiter, Chelsea Peroutka.  Ms. Peroutka passed Ms. Gordwin along and scheduled her for a series of in person interviews on May 16, 2019.

45.     On May 9, 2019, prior to her in-person interviews, Ms. Gordwin was contacted by Darren Baltz, HR Manager, and cautioned that the role Ms. Gordwin had applied for "may be" awarded to an internal candidate.  Mr. Baltz said that internal candidates are typically favored.

46.     Mr. Baltz then told Ms. Gordwin about several Senior HR Business Partner ("Sr. HRBP") roles and urged her to consider that position should she not be hired for the HR Manager role.  Mr. Baltz claimed that the Sr. HRBP roles are equivalent to HR Manger roles and provide the same opportunity for growth and promotion at Amazon.

47.     On May 16, 2019, Ms. Gordwin had in-person interviews with Andrew Walker (General Manager for the Joliet fulfillment center), Fabio Higa (Technical Account Management Specialist), Cabell Wagner (Regional Sr. HR Manager) and Brian Bayless (HR Manager).

48.     Despite her qualifications, Ms. Gordwin was rejected for the position.

49.     During a call with Ms. Peroutka on May 20, 2019, Ms. Gordwin was told that the HR Manager position was offered to an internal Amazon candidate.  Once again, Ms. Gordwin heard that Amazon "favors" internal candidates for positions.

50.     Ms. Peroutka then asked if Ms. Gordwin would consider a Sr. HRBP role. After again being told that the Sr. HRBP role is equivalent to an HR Manger role, Ms. Gordwin indicated that she would be interested.

51.     Several days later on May 23, 2019, Sarah Ebert, Regional Sr. HR Manager, reached out to Ms. Gordwin to screen her for a Sr. HRBP (Level6) position supporting the logistics business unit in the Chicago metro area.  Ms. Ebert also said the position provided the same opportunities for growth at Amazon.

52.     On May 29, 2021, Ms. Gordwin was offered the Sr. HRBP role, and she accepted.

## II.     Ms. Gordwin's First Role: Sr. HRBP

53.     In June 2019, Ms. Gordwin started as a Sr. HRBP (Level 6) reporting to Sara Ebert, supporting Amazon's Logistics Business Unit in the Chicago metro area.  During Ms. Gordwin's second week of training, her trainer quit Amazon.

54.     Outrageously, Amazon failed to give her a replacement trainer.  As such, with just one full week of "training," Ms. Gordwin was expected to perform.

55.     Amazon assigned Ben Jaehning, a white male at Level 5, as her "mentor." Notably, Mr. Jaehning was less senior than Ms. Gordwin at the time.

56.     Rather than providing mentorship, Mr. Jaehning quizzed Ms. Gordwin about subject areas in which Ms. Gordwin had not been trained.  Appallingly, Mr. Jaehning criticized her for not having the correct answers to his questions.

57.     On multiple occasions, such unfair critiques led to Ms. Gordwin feeling incredibly degraded and humiliated.  Several times, she broke down and cried in the workplace.

10

58.     On August 13, 2019, after being humiliated too many times, Ms. Gordwin reached out to Ms. Ebert to request the training she was denied.  She also asked that Mr. Jaehning no longer "mentor" her.

59.     Although she eventually was assigned another trainer, by this time, the experience had been so negative with Mr. Jaehning that Ms. Gordwin applied for, received and accepted a Sr. HRBP role on another team.

### III.     Ms. Gordwin's Second Role: Sr. HRBP

60.     In October 2019, Ms. Gordwin began her second role at Amazon as a Sr. HRBP (Level 6) reporting to Mary Woosley, a white Regional Sr. HR Manager, supporting Amazon's Logistic Business Unit in the Phoenix, Arizona region.

61.     The lack of diversity in the higher ranks of this team is particularly troubling. Specifically, out of the 13 employees in the level above Ms. Gordwin, Level 7, only one of them is Black.

62.     Ms. Gordwin quickly demonstrated her talent and capabilities in this role. For example, she demonstrated initiative by recognizing and addressing a problem related to compensation rate calculation errors of a large network of drivers that Ms. Gordwin's new team supported.  Ms. Gordwin devised a plan to address the issue and oversaw the implementation of the plan – requiring her to coordinate with HR professionals across several teams concerning changes that impacted thousands of employees.

63.     As a result of her strong performance on this project, Ms. Gordwin received glowing positive feedback from Ms. Woosley.

64.     In January 2020, while engaged in a series of organizational review meetings where Ms. Gordwin was able to observe the demographics of senior leadership, Ms. Gordwin was shocked to see a total lack of female leadership in her region.  Ms. Gordwin voiced her concerns to Ms. Woosley.

65.     Once again, Ms. Gordwin seized an opportunity to solve a problem at Amazon.  Ms. Gordwin formed a support group ("Women in Logistics") to advance and

assist women leaders in the logistics division.  As a result of Women in Logistics' success, several women members of the group were promoted.

66.     Despite Ms. Gordwin's successful work, Amazon devalued and demoralized Ms. Gordwin.  By way of example only, during a discussion about two junior employees, Ms. Woosley criticized Ms. Gordwin's "tone and approach."  Ms. Gordwin perceived the commentary to imply that as a Black female, she was being overly harsh and aggressive.

67.     Feeling attacked and marginalized, Ms. Gordwin forwarded Ms. Woosley emails between herself and her direct reports to prove that Ms. Gordwin maintained a professional "tone and approach."

68.     Shockingly, Ms. Gordwin also learned from another coworker – that after seeing Ms. Gordwin's photo, one of her white direct reports remarked that she knew she "wouldn't get along" with Ms. Gordwin.  Other than Ms. Gordwin's Black skin, it is difficult to imagine how or why a junior employee would reach such a decisive conclusion about a person she had never met.

69.     In March 2020, Ms. Woosley was promoted.  Thereafter, Gina Distaso, a white Regional HR. Manager, became Ms. Gordwin's supervisor.

70.     There are simply too many events that show how Ms. Distaso demeaned and marginalized Ms. Gordwin to set forth in this complaint.  However, by way of example only, after the pandemic caused employees to seek safety in their own homes, including Ms. Gordwin, based on no objective factors, Ms. Distaso insisted that Ms. Gordwin work in a physical Amazon office.  Specifically, she was forced to report to several logistics facilities in the Phoenix area that were supported by their HR team.

71.     In short, there was no need for Ms. Distaso to insist on this in the middle of a pandemic.  Out of the approximately six employees that reported to Ms. Distaso, at least four worked remotely from home during the pandemic.

72.     Ms. Distaso's unreasonable requests for Ms. Gordwin to work in-person included days where Ms. Gordwin was on business calls all day.  As a result, Ms. Gordwin often had to set up in the break rooms or common areas of a facility to take important calls.

73.     As described in more detail below, without objective metrics, Ms. Distaso gave Ms. Gordwin's white male coworkers more meaningful projects, such as on Company-wide issues that in turn gave the men better opportunities to advance.

**IV.     Ms. Gordwin Is Openly Mocked by a White Male Manager, Garrett Place**

74.     In May 2020, a male manager, Korbin Moss, complained to Ms. Gordwin that a white male manager, Garrett Place, was retaliating against him.  Because it is her job, Ms. Gordwin scheduled a meeting with Mr. Place to discuss the complaint.

75.     During the meeting, in which Ms. Distaso was present, Mr. Place demeaned and embarrassed Ms. Gordwin.  Mr. Place chided Ms. Gordwin for suggesting that he needed to "ask her permission" about how he "handles things."

76.     Shockingly, rather than supporting Ms. Gordwin, Ms. Distaso made light of Mr. Place's behavior.  When Ms. Gordwin complained that Mr. Place treated her like this "all the time," Ms. Distaso remarked that she liked Mr. Place's "feistiness."

77.     On a nearly daily basis Ms. Distaso communicated with Ms. Gordwin in a demeaning and disrespectful manner.

78.     On June 2, 2020, Ms. Gordwin reached out to Renee Thomas, a Black female, who was Ms. Gordwin's "HR for HR" representative.  Ms. Gordwin told Ms. Thomas that she could no longer work for Ms. Distaso and provided examples of the harassing and constant belittling that she experienced from her.

79.     The situation was so bad that Ms. Gordwin told Ms. Thomas that she was willing to "drop to Level 5" if she "had to."  Because Ms. Thomas was in the process of

transferring roles herself, she assigned Ms. Gordwin another HR for HR representative, Becky Chefan, a white female.[13]

80.     Shortly after Ms. Gordwin reached out to Ms. Thomas and Ms. Chefan, Ms. Distaso reached out to Ms. Gordwin about setting up a meeting.  Ms. Gordwin responded that she did not "feel supported" and further indicated that, due to the anxiety caused by interacting with Ms. Distaso, she preferred not to have a meeting with Ms. Distaso on the eve of a surgery.  Ms. Gordwin noted to Ms. Distaso that she included her on the email containing Ms. Gordwin's leave coverage information and further provided Ms. Distaso with the name of the employee who would be covering for her.

81.     On June 10, 2020, while on leave, Ms. Gordwin had a call with Ms. Thomas and Ms. Chefan to discuss her mistreatment and lack of support.  Ms. Gordwin explained to Ms. Thomas and Ms. Chefan that Ms. Distaso's mistreatment was causing her severe anxiety and depression.  In discussing her terrible experiences, Ms. Gordwin was so upset that she needed to pause throughout the call because she was crying uncontrollably.

82.     Ms. Gordwin, once again, told Ms. Thomas and Ms. Chefan that the situation was so harmful to her mental health that she would be willing to "drop a level" to escape Ms. Distaso.  Ms. Thomas and Ms. Chefan asked Ms. Gordwin if she had reached out to Ms. Woosley, Ms. Distaso's supervisor.

83.     As Ms. Woosley had herself previously degraded and applied the "aggressive Black woman" racial stereotype to Ms. Gordwin, Ms. Gordwin was uncomfortable reaching out to her.  Ms. Gordwin also said that she did not reach out to Ms. Woosley because Ms. Woosley and Ms. Distaso appeared to be good friends.

84.     Ms. Gordwin further noted that she had applied for several position transfers and had not received the roles.  Ms. Thomas and Ms. Chefan provided no substantive guidance and informed Ms. Gordwin to keep applying for other roles.

---

[13] While coordinating with Ms. Thomas and Ms. Chefan, Ms. Gordwin informed them that she was set to go on a medical leave of absence on the following day, June 3, 2020.

85.    Ms. Gordwin's complaints were never fully addressed.

86.    Nevertheless, it is clear that these HR employees understood Ms. Gordwin's complains about Ms. Distaso involved racial bias.  Their "solution" was to assign a Black female executive, Rithka Ayres, to help Ms. Gordwin "navigate the situation."

87.    Ms. Gordwin returned to work from leave in July 2020 and immediately was confronted with additional hostile treatment.

88.    On July 20, 2020, during a leadership review call with Ms. Distaso and a Level 7 employee, Ms. Gordwin was demeaned by Ms. Distaso.  During the call, Ms. Gordwin and Ms. Distaso were discussing the performance of the Level 7 employee's direct report, Tim Peterson.

89.    Ms. Gordwin said that she was made aware of a complaint concerning Mr. Peterson.  Mary Sidum, a female leader that was supervised by Mr. Peterson, reported that she resigned due to Mr. Peterson's mistreatment and, also, because she did not receive adequate support and training.

90.    Ms. Gordwin was sympathetic to Ms. Sidum's complaints because they were similar to her experiences at Amazon.  Ms. Gordwin believed it was important for the complaint to be discussed during the review of Mr. Peterson's performance.

91.    However, Ms. Distaso immediately shut down Ms. Gordwin and aggressively scolded her for raising her concerns.  This left Ms. Gordwin feeling embarrassed and humiliated and demonstrated that Ms. Distaso's dismissal of Ms. Gordwin's professional experience had few limits – even if it meant silencing Ms. Gordwin's attempt to discuss an important complaint of mistreatment and potential discrimination.

92.    On July 21, 2020, Ms. Gordwin went back on medical leave until August 27, 2020.  This period of leave qualified as FMLA leave.

93.    In response to Ms. Gordwin taking FMLA leave, the terms and conditions of her employment were altered.  Ms. Gordwin returned from leave to find all of her direct reports reporting to somebody else.

94.    In doing so, Amazon punished Ms. Gordwin for exercising her legal right to take medical leave and continued its pattern of discriminating against Ms. Gordwin due to her race.

95.    Further, Ms. Distaso failed to inform Ms. Gordwin that her direct reports would no longer be reporting to her.  Instead, Ms. Gordwin learned of this change from the very person that her direct reports were reassigned to, Pamela KimBrough.

96.    Shortly after her return, Ms. Gordwin led a conference call with approximately ten other employees.  At the conclusion of the call, Ms. Gordwin heard one of the participants remark (in a surprised tone) that Ms. Gordwin was "not so bad to work with."  This humiliated and degraded Ms. Gordwin.

97.    On November 10, 2020, to escape Ms. Distaso, Ms. Gordwin applied for the role of Sr. HR Specialist on another team.  She was hired for the role.  Once again Ms. Gordwin made a lateral move that had no pay raise or career progress.

98.    There is no question that coworkers witnessed and recognized Ms. Distaso's mistreatment of Ms. Gordwin.  In fact, on February 4, 2021, shortly after she started on another team, one of Ms. Gordwin's coworkers from her previous team called to say that Ms. Distaso was leaving the team so that Ms. Gordwin "can come back now."

**V.    Ms. Gordwin's Third Role: Sr. HR Specialist**

99.    On January 11, 2021, Ms. Gordwin started as a Sr. HR Specialist role (Level 6) reporting to Senior Talent Manager John Simpson (Level 7) supporting Amazon's Global Delivery Services Business Unit.  Notably, Ms. Gordwin has more years of HR experience and educational qualifications (MBA) than her new white male boss, Mr. Simpson (Level 7).

100.   Prior to Ms. Gordwin accepting this role, in an attempt to extinguish Ms. Gordwin's desires for career advancement, Mr. Simpson told Ms. Gordwin that the role would provide no opportunities for promotions or growth.  Within approximately one week of Ms. Gordwin being on the team, Mr. Simpson left on paternity leave.

101.   He failed to arrange for any training or mentoring of his new junior report. Despite the fact that she was on a team involving work at Amazon that she previously was not exposed to, Mr. Simpson expected her to simply "know how" to draft reports for Vice President Level employees, without any training or oversight.

102.   Such a situation was destined to set up Ms. Gordwin to fail.

103.   On or around February 17, 2021, Ms. Gordwin went on medical leave.

104.   On April 12, 2021, Ms. Gordwin returned from medical leave and continues to experience emotional distress due to the discriminatory environment at Amazon.

## VI.   Discriminatory Promotion Process: Favorable Treatment of White Male Employees

105.   Throughout Ms. Gordwin's employment at Amazon, she has applied for no less than ten internal positions.

106.   In contrast to what she was told when she was rejected at hiring for the HR Manager position, *i.e.*, that "internal employees are given priority for open positions," Ms. Gordwin was passed over repeatedly while outside individuals were hired for jobs to which she applied.[14]

107.   When she dared to question the inconsistent and misleading "explanations," white managers at Amazon gave her more pretextual excuses.  By way of example only, Ms. Gordwin was told that the positions she sought – including for other supposedly equivalent HR Manager roles – required her manager's recommendation or outright promotion before she could be hired.

---

[14]   In her HR capacity, Ms. Gordwin was involved in many interviews.  Through this process she learned that the message about internal candidates being favored was false.

108.    Given her treatment by her white managers, it is not surprising that on at least four occasions, Ms. Gordwin withdrew her application for a promotion because she was told that a manager needed to recommend her.  In this regard, for the position of Sr. Program Manager HR M&A, Ms. Gordwin received feedback that strongly suggested Ms. Distaso had interfered with the process.

109.    Instead of being provided opportunities for advancement like her white male peers, Ms. Gordwin has been forced to settle for lateral moves, none of which are signs of career advancement.  In addition, Ms. Gordwin was rejected for another four potential internal roles.

110.    Meanwhile, in sharp contrast, Ms. Gordwin's less experienced white male colleagues have been provided with opportunities and support that result in accelerated career advancement.

111.    By way of example, Amazon has provided Caleb Viles and Ben Jaehnig – two white male employees in comparable roles to Ms. Gordwin – with more opportunities and has placed them on a faster promotion track.

112.    Amazon awarded Mr. Viles an HR Manager role, a role that Amazon has consistently denied to Ms. Gordwin despite her having commensurate HR experience. Currently, Amazon is providing Mr. Viles with the opportunity to perform the functions of a Regional Sr. HR Manager (Level 7), setting him up for a promotion to Level 7.

113.    Similarly, Amazon has provided Mr. Jaehnig with more opportunities and placed him on a faster promotion track.

114.    While on Ms. Gordwin's team, Mr. Viles and Mr. Jaehnig received several Company-wide projects, while Ms. Gordwin was constrained to regional projects.

115.    Amazon's purposeful failure to provide Ms. Gordwin with a role that is commensurate with her experience has resulted in Ms. Gordwin sustaining significant losses in compensation.

116.    Missing out on a single level can quickly lead to hundreds of thousands of dollars in lost compensation, as the difference between annual equity paid out to a L6 versus a L7 employee can easily be $150,000 to $200,000 or more, with the difference at time of hiring even higher than that and, of course, the value of each unit of that equity continues to grow with Amazon's stock price.

117.    Ms. Gordwin knows of other Black employees (male and female) who have similarly faced a lack of support at Amazon.

118.    By way of example, in February 2021, Ms. Gordwin was approached by a friend who knew she worked at Amazon and asked Ms. Gordwin to reach out to Andrea Brown, a Black female Amazon HR employee in North Carolina who was one month into her role and struggling.

119.    As Ms. Brown described her onboarding experience to Ms. Gordwin, Ms. Gordwin was disturbed to learn that Amazon had subjected Ms. Brown to a similar lack of training and support that both of their white colleagues did not appear to experience.  Ms. Brown informed Ms. Gordwin that she was so frustrated with the experience that she was considering quitting Amazon.

120.    All too familiar with Ms. Brown's struggle, Ms. Gordwin spent hours providing Ms. Brown with training.  Ms. Brown was incredibly grateful and informed Ms. Gordwin that Ms. Gordwin provided her with more training and support over the course of that day than she had received throughout her entire onboarding.

## VII.    The Data Shows Systemic Discrimination at Amazon

121.    Amazon's discriminatory treatment of Ms. Gordwin and other Black employees is evidenced not only in its inequitable hiring and promotion practices, but through its failure to prioritize and remedy a dearth of Black representation, particularly in its top corporate ranks.

122.    As part of her responsibilities in HR, Ms. Gordwin had access to D&I data for Amazon's U.S. employees reporting up to Felton, the Vice President of Global Delivery

Services.  In August 2020, Felton became one of the 26 members of Bezos' elite "S-team." In the U.S., approximately 13,600 employees reported up to Felton as of February 28, 2021.

123.   The data shows the numbers of employees that were terminated, by level and by race.   Although the numbers speak for themselves, the disparities are shocking.

124.   At L10, Amazon's highest corporate tier, the data showed not a single termination for a person of color.  Presumably, no persons of color existed at L10.

125.   In 2018 and 2020 at L8, similarly, not one BLNA employee was terminated. In 2019, the data showed that BLNA employees made up just 7% of all L8s, yet BLNA employees represented 12.5% of all terminations that year.

126.   Predictably, the data reflects that in 2018, not a single BLNA employee was promoted (0%) whereas 16 white and Asian employees were promoted (100%).

127.   In 2019, at the L7 level BLNA employees constituted just 9.8% of all L7 employees that year.  Incredibly, the data shows 13 terminations for BLNA employees which represented 24% of all terminated L7 employees.

128.   In stark contrast, white and Asian employees represented 90% of all L7 employees, but just 64% of all terminations.

129.   Promotions for this 2019 group of L7 employees is equally horrific.  Out of a total of 15 promotions, only two of the 15 were BLNA employees, suggesting that Amazon is not trying nearly as hard as it claims to provide more opportunities for diverse employees.

130.   Similarly, in 2018 for L6 employees, BLNA employees represented 9% of all employees that year whereas white and Asians represented 91%. Despite this disparity, 23 BLNA employees were terminated representing 15% whereas just 50% of all terminations were for white employees.  What is shocking is that the numbers barely improve.  In 2019 at the L6 level, BLNA employees represented 14.5% of all employees terminated versus whites at 56% with the same relative total employee percentages.

131.    Statistically, there is no rational explanation for why BLNA employees are terminated at substantially higher rates than white employees while simultaneously promoted at far lower levels.

132.    Adding a further layer to the racial disparities at Amazon, Amazon engages in a pattern of disproportionately providing lower performance ratings to Black employees.

133.    For example, with respect to the same group of employees in the reporting structure outlined above, when considering the number of white and BLNA employees at Level 7, BLNA employees constitute 15% of Level 7 employees.  Yet, BLNA employees account for nearly 30% of the Level 7 employees who received a rating of least effective ("LE").

134.    A similar trend occurs throughout numerous other position levels.  With respect to white and Black Level 5 employees, Black employees represent approximately 35% of the total for white and Black employees but account for 43% of the employees who received a LE rating.

135.    Statistical data will be able to demonstrate that Amazon's discriminatory conduct is prevalent across most of Amazon's practices and procedures including, but not limited to, hiring, terminations, performance evaluations and promotions.

## FIRST CAUSE OF ACTION

### (Retaliation under the FMLA)

136.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

137.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Similarly, at all times relevant herein, Defendant Amazon.com, Inc. was and is a "covered employer" within the meaning of the FMLA.

138.    At all times relevant herein, Plaintiff was a full-time employee of Defendant that 1,250 hours or more during the twelve months prior to the start of any leave constituting FMLA leave.

139.   At all times relevant herein, Defendant employed fifty (50) or more employees at Ms. Gordwin's location of employment and/or within seventy-five (75) miles of Ms. Gordwin's location of employment.

140.   By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her decision to exercise her rights under the FMLA.

141.   As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

142.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

143.   Defendant's unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Section 1981)

144.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.   By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment because of her race and/or color and subjecting her to a hostile work environment because of her race.

146.   As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

147.   As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

148.   Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION

**(Retaliation in Violation of Section 1981)**

149.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

150.   By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on her protected activities in violation of Section 1981.

151.   As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

152.   As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

153.   Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

B.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.      An award of punitive damages;

F.      An award of liquidated damages;

G.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:      May 19, 2021.

**BONNETT FAIRBOURN FRIEDMAN & BALINT, PC**

By:  s/ Ty D. Frankel
Ty D. Frankel
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
tfrankel@bffb.com

**WIGDOR LLP**
Jeanne M. Christensen (*pro hac vice* to be submitted)
jchristensen@wigdorlaw.com
Lawrence J. Pearson (*pro hac vice* to be submitted)
lpearson@wigdorlaw.com
Alfredo J. Pelicci (*pro hac vice* to be submitted)
apelicci@wigdorlaw.com
Anthony G. Bizien (*pro hac vice* to be submitted)
abizien@wigdorlaw.com
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

*Attorneys for Plaintiff*